# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

U.S. DISTRICT COURT
N.D OF ALABAMA

| | | |
|---|---|---|
| MEGHAN JOHNSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CV-99-PT-3199-M |
| | ) | |
| PROFESSIONAL INVENTORY | ) | |
| MANAGEMENT AND | ) | |
| MERCHANDISING SERVICE, | ) | |
| | ) | |
| Defendant. | | |

ENTERED
DEC 18 2000

## MEMORANDUM OPINION

This cause comes to be heard upon the defendant Professional Inventory Management and Merchandising Service's ("PIMMS") Motion for Summary Judgment filed on September 27, 2000.[1]

## FACTS

Defendant PIMMS contracts with merchandise retailers to provide merchandising and inventory management directly in the retailers' stores.  PIMMS uses three levels of employees in its clients' stores: "Retail Merchandisers," "Crew Assistants," and "Crew Coordinators." Usually, a personnel organizer called a "Field Manager" would place one crew coordinator, one crew assistant, and several retail merchandisers in each store.  The crew coordinator served as the general retail supervisor of the store.

---

[1] Apparently, after the plaintiff brought this action, PIMMS was acquired by Gage Merchandising Services ("Gage").  On April 12, 2000, this court entered an order granting the plaintiff's motion to substitute Gage for PIMMS as the named party.  However, subsequent briefs, motions, and orders have retained "PIMMS" as the name of the defendant.  To avoid confusion, the court will continue to use the name "PIMMS" in reference to defendant, keeping in mind that the actual name of the party in interest is "Gage."

1

Plaintiff Meghan Johnson ("Johnson") was a PIMMS employee from August, 1997 to April, 1999. During that time, her job title was "Crew Assistant." The basic duties of a crew assistant are to implement "planograms;"[2] install fixtures and displays; assist with paperwork; supervise, train, and evaluate the retail merchandisers; and assist the crew coordinator as requested. Even though they somewhat supervise the retail merchandisers, the crew assistants are nonetheless subordinate to the crew coordinators. They are paid hourly and are to receive "overtime" pay when their hours-per-week exceed forty hours.

The crew coordinators are the top supervisory-level employees in stores. They shoulder the ultimate responsibility for what happens in their stores. Although the tasks of a crew assistant and a crew coordinator overlap, only the crew coordinator is ultimately responsible for seeing that PIMMS's duties in the store are accomplished. Additionally, the crew coordinators do not train the retail merchandisers. Because of the crew coordinators' superior responsibility and positions of leadership, the position is salaried. Crew coordinators do not receive "overtime" pay. They are supervised by "field managers," who place them in particular stores, and "area managers," who supervises PIMMS operations in all the stores in certain geographical areas.

Shortly after Johnson became a crew assistant, one of PIMMS's major clients, the drugstore chain CVS, began to require that all PIMMS employees working in CVS drugstores be "certified" to do their jobs. The certification process required additional training and the successful completion of one or more tests. PIMMS selected four crew assistants, including Johnson, to administer this additional training. Johnson and the other crew assistants were given

---

[2] A "planogram" is the diagram of the arrangement of inventory within a store.

2

a special title, "Senior Retail Merchandiser." Although Johnson was administering the
certification program, she was not certified herself. Whether Johnson continued to function as a
senior retail merchandiser or returned to regular crew assistant duties appears to be in dispute.

In late 1998, Johnson asked for a pay raise. Paul Thompson, a PIMMS area manager,
conditioned the pay raise on Johnson's passing the entry-level and intermediate certification
tests. Johnson became certified on March 17, 1999. Johnson's pay raise was authorized on
April 1, 1999, but was not implemented before she resigned on April 14, 1999. The raise was to
be retroactive.

While Johnson was a PMMS employee, the company developed a new payroll system in
which employees reported their hours by keying them in from a touch-tone telephone. Each
employee was personally responsible for properly reporting her hours every day. The hours that
the employee reported were automatically recorded, tallied, and printed on payroll sheets that
show the number of hours worked, the division of the pay into regular pay and overtime pay, and
the deduction of the applicable taxes, etc. Employees could view their individual payroll sheets
on the company's special computer software.

In late August, 1998, Johnson began complaining of "flu-like" symptoms. In January
1999, she stayed away from work for a full week, claiming that she had a sinus infection,
although the excuse note that she obtained from her physician excused her from work for only
three days. PIMMS informed Johnson that in order to take any further medical leave, she would
have to obtain a physician's note certifying that the leave was necessary.

In March, 1999, Johnson saw her gynecologist for flu symptoms and pain in her hands
and joints. She was referred to Dr. Michael Grelier, a rheumatologist. She visited Dr. Grelier
only once, on April 9, 1999. After examining Johnson, taking x-rays, and performing blood

3

work, Dr. Grelier concluded that Johnson's complaints were most consistent with either menopausal arthralgia or fibromyalgia. In an attempt to eliminate menopausal arthralgia as a possibility, Dr. Grelier prescribed Naprosyn to determine whether Johnson would respond to anti-inflammatory drugs. Dr. Grelier neither definitively diagnosed Johnson's condition nor prescribed a course of long-term treatment for her. Johnson filled the Naprosyn prescription only once and never returned to Dr. Grelier for a follow-up examination.

Two weeks before leaving her employment with PIMMS, Johnson took a two-week medical leave of absence from work but did not produce a physician's note. On April 12, 1999, her immediate supervisor, Frank Dohlon, called her and informed her that if she did not return to work or produce a physician's excuse for any subsequent medical absences, she would be discharged. The next day, Johnson called Dr. Grelier's office to request a medical excuse for a leave of absence from work. Dr. Grelier's phone log shows that he denied Johnson's request because he felt that, in her case, a leave of absence from work was not medically necessary. Johnson did not attempt to obtain certification from another physician or to contact PIMMS to request additional time to obtain certification.

On April 14, 1999, Johnson submitted a letter of resignation to PIMMS' Senior Vice President of Human Resources. Johnson's resignation letter contained several complaints about the manner in which her Area Manager, Paul Thompson, treated her.[3] The complaints contained allegations that she had worked overtime hours for which she had not been properly compensated because she had been required to "roll them over" into the next week's hours.

_____

[3] Specifically, Johnson complained that Thompson gave two other employees, Beth Stonebraker and Rod Kirkland, pay raises without their having passed intermediate certification, assigned the plaintiff to a demanding crew coordinator who required her to roll her weekly overtime hours into the next week, and made several statements to the effect of "get rid of her."

4

Johnson also claimed that PIMMS owed her retroactive raise money from August 25th, 1998 (her one-year anniversary with PIMMS) until April 14, 1999. Johnson's resignation was effective on April 15, 1999.

PIMMS's Human Resource Manager, Jean Lux, replied to Johnson's letter of resignation with a letter dated April 19, 1999. In the reply letter, Lux addressed the complaints that Johnson had raised in her resignation letter. Specifically, in reference to the overtime hours that Johnson claimed that she had worked but had rolled over into the next week, Lux stated "Please submit the documentation immediately so we can get you paid of [sic] any overtime hours you worked without pay. That is strictly against our policy and the pay for hours worked will be corrected immediately." Johnson did not respond to Lux's letter.

Johnson filed her initial complaint on December 1, 1999. The initial complaint contained only claims under the Family Medical Leave Act ("FMLA"), the Equal Pay Act ("EPA"), and the Fair Labor Standards Act ("FLSA"). After receiving a right to sue letter from the EEOC on February 17, 2000, Johnson amended her complaint to allege various counts of gender discrimination under Title VII.[4] In total, the plaintiff alleges seven causes of action: (1) Failure to notify her of her rights under the FMLA; (2) Interference with her rights under the FMLA; (3) Pay discrimination under the EPA; (4) Failure to pay overtime under the FLSA; (5) Gender-based pay discrimination under Title VII; (6) Gender-based disparate treatment under Title VII; and (7) Gender-based wrongful discharge under Title VII.

PIMMS moved for summary judgment on all claims on September 27, 2000. According

---

[4] The amended complaint also added as party plaintiffs Cheri Grapes and Beth Stonebraker, two of Johnson's former co-workers. Grapes and Stonebreaker were voluntarily dismissed from this action without prejudice on July 24, 2000.

5

to PIMMS, this court should grant summary judgment because "at the completion of discovery,
plaintiff has not marshaled sufficient evidence to support any of her multiple, vague and
conclusory allegations." In short, PIMMS argues that (1) Johnson's FLSA claim fails because
the undisputed evidence shows that she was paid overtime pay for all overtime hours that she
reported; (2) Johnson's EPA and Title VII pay discrimination claims fail because she has failed
to produce any evidence that she was paid less than any similarly situated males; (3) Johnson's
FMLA claims fail because she has introduced no evidence that PIMMS denied any of her
requests for sick leave or that she provided certification of a serious medical condition
preventing her from working; and (4) Johnson's Title VII claims fail because she cannot make
out a prima facie case or, in the alternative, show pretext.

## THE STANDARD FOR SUMMARY JUDGMENT

A motion for summary judgment is to be granted if there is no genuine issue of material
fact. United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991). A
factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for
the non-moving party." Id. The evidence of the non-moving party is to be believed, and the
court is not to attempt to perform jury functions such as credibility determinations. Id. After
considering everything in the record, all permissible inferences are to be drawn in favor of the
non-moving party. Clinkscales v. Chevron USA, Inc., 831 F.2d 1565, 1570 (11th Cir. 1987).

When the non-moving party has the burden of proof at trial, she must come forward with
sufficient evidence on each element that must be proved. Earley v. Champion International
Corp., 907 F.2d 1077, 1080 (11th Cir. 1990). If the evidence is merely colorable or is not
significantly probative, summary judgment may be proper. Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986). Summary judgment is appropriate if on any

6

element there would be insufficient evidence to require submission of the case to a jury. Earley, 907 F.2d at 1080. "The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such circumstances, there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 327 106 S. Ct. 2548, 2555 (1986).

## ARGUMENT

The court will address each of PIMMS's arguments and each of Johnson's responses under each cause of action in turn. The court will interject its own discussion.

### Johnson's claims under the FMLA

In her amended complaint, Johnson claims that, after "months of treatment" for chronic muscle and joint pain, she was "officially"diagnosed with fibromyalgia in April, 1999. Johnson claims that "on many occasions" she presented PIMMS with written excuses provided by a physician whom she visited "on a regular basis." Johnson then claims that fibromyalgia qualifies as a "serious health condition" under the FMLA, and that she informed PIMMS of her need to take medical leave. Johnson alleges that "an employer has an affirmative obligation to give notice to its employees as to their rights and responsibilities under the FMLA at the time leave is sought," and that "whenever an employee requests leave which could be covered by the FMLA, the employer is under an obligation to provide that employee with notice of her rights

7

and responsibilities under the FMLA."[5] Johnson concludes in Count I of her complaint that by failing to inform her of her right to take FMLA leave and by "[n]either expressly denying or granting her leave [in writing] under the FMLA," PIMMS denied Johnson her FMLA rights. Johnson also claims in Count II of the complaint that by requiring her to either submit medical certification for further absence, report to work, or be discharged, PIMMS interfered with the exercise of her FMLA rights.

PIMMS moves for summary judgment on Johnson's FMLA claim generally on the grounds that the undisputed facts establish that: (1) Johnson did not suffer from a serious medical condition; and (2) Johnson was never denied any requested leave. PIMMS first argues that Johnson cannot establish that she suffered from a serious medical condition within the meaning of the FMLA. The definition of "serious health condition" in the FMLA is:

"The term "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves--
(A) inpatient care in a hospital, hospice, or residential medical care facility; or
(B) continuing treatment by a health care provider."

29 U.S.C. § 2611. PIMMS argues that the undisputed evidence shows, as a matter of law, that the plaintiff was neither an inpatient in a hospital nor the recipient of continuing treatment by a health care provider. According to PIMMS, the evidence shows that Johnson, claiming that she had a "sinus infection," submitted a physician's excuse for a three-day absence in January, 1999. Between January and March 1999, Johnson may have seen a physician in Tennessee.[6] Next, in March, 1999, Johnson saw her gynecologist, whom she visits once every two years. Johnson's

---

[5] It is undisputed that PIMMS is a qualifying employer and Johnson is a qualifying employee under the FMLA.

[6] Johnson cannot completely remember whether she saw a physician in Tennessee or not. She thinks the physician's first name may have been "Susan," but cannot recall whether the physician practiced in Knoxville, Alcoa, or Maryville. Johnson depo., p. 73-74.

8

gynecologist referred her to Dr. Grelier, a rheumatologist. Johnson's single visit to Dr. Grelier

occurred on April 9, 1999. According to Dr. Grelier, he concluded that Johnson had either

menopausal arthralgia or fibromyalgia, but did not definitively diagnose Johnson with either

one.[7] Instead, he prescribed Naprosyn, predicting that Johnson's response to the medication

would eliminate one of the possible diagnoses. Dr. Grelier prescribed no other course of

treatment for Johnson, but suggested that she consider estrogen therapy. He refused to provide

her with an excuse from work on April 13, 1999, because he felt that her condition did not justify

a leave of absence from work. Johnson did not return to see Dr. Grelier.[8] PIMMS argues that

these undisputed facts of Johnson's medical history show that Johnson was not engaged in a

continuing course of treatment at the time that she left PIMMS.

Closely related to the continuing course of treatment requirement of a serious medical

condition, PIMMS argues, is the employee's ability to perform the functions of her position.

The regulations promulgated to implement the FMLA, found at 29 C.F.R. §§ 825.100 *et seq.*,

entitle every eligible employee to twelve weeks of unpaid medical leave "[b]ecause of a serious

health condition that makes the employee unable to perform one or more of the essential

functions of his or her job."[9] § 825.200(a)(4). PIMMS points to § 825.115, entitled "What does

it mean that the employee is unable to perform the functions of the position of the employee?,"

---

[7] Dr. Grelier noted on Johnson's medical chart, however, that if Johnson indeed had fibromyalgia, she would have to embark on "long-term treatment."

[8] Dr. Grelier does not know whether Johnson made a follow-up appointment. Johnson contends that she did not seek additional traditional medical treatment for her condition after her resignation from PIMMS because she is uninsured and has been unable to afford it. She has, however, visited two chiropractors.

[9] The regulations grant leave under 3 other circumstances: (1)The birth of the employee's child; (2) The placement with the employee of an adopted child or foster child; and (3) The need for the employee to care for an immediate family member with a serious health condition. §§ 825.200(a)(1)-(3).

9

which states, in pertinent part, that:

> "An employee is "unable to perform the functions of the position" where the
> health care provider finds that the employee is unable to work at all or is unable
> to perform any one of the essential functions of the employee's position within
> the meaning of the [ADA] and the regulations at [§ 1630.2(n)]. An employee
> who must be absent from work to receive medical treatment for a serious health
> condition is considered to be unable to perform the essential functions of the
> position during the absence for treatment."

PIMMS argues that the regulations require that a health care provider find that the employee is

unable to perform at least one essential function of her position. Because the evidence shows

that Dr. Grelier did not consider a leave of absence from work to be medically necessary for

Johnson, PIMMS argues, Johnson cannot make the showing that she was unable to perform an

essential element of her job, entitling PIMMS to summary judgment.

PIMMS further contends that Johnson's FMLA claim should be dismissed as a matter of

law because the undisputed facts show that PIMMS never denied Johnson's requests for medical

leave. PIMMS notes that it granted Johnson a week-long leave of absence for her sinus infection

in January 1999. Next, in April 1999, PIMMS granted Johnson a two-week leave of absence.

PIMMS maintains that because Johnson voluntarily resigned when her physician refused to

certify that she needed a leave of absence from work, without requesting additional time to seek

a second medical opinion, PIMMS could not have violated the FMLA with regard to ending

Johnson's employment.

Johnson argues that the facts preclude a finding that, as a matter of law, she was not

undergoing continuing treatment by a health care provider. Johnson points to 29 C.F.R §

825.114, which states, in pertinent part:

> "(2) Continuing treatment by a health care provider. A serious health condition
> involving continuing treatment by a health care provider includes any one or more
> of the following:

10

     (i) A period of incapacity (i.e., inability to work . . .) Of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

     (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant . . . under orders of, or on referral by, a health care provider; or

     (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider."

Johnson interprets the regulation to mean that "continuing treatment by a health care provider" can be shown by *either* a showing of a period of incapacity, treatment two or more times by a health care provider, treatment by a health care provider which results in a regimen of continuing treatment, *or* a medical condition which requires an absence from work of three or more days. Johnson argues that because her "medical condition" caused her to miss two weeks of work, she has shown a continuing course of treatment within the meaning of the regulation.

     Johnson's interpretation of 29 C.F.R. § 825.114 runs contrary to the plain language of the regulation. The regulation specifically requires a period of *incapacity* of three or more consecutive calendar days, which the regulation defines as "the *inability* to work, attend school, or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom . . . ." The *inability to work* is a much more serious condition than the simple *absence from work*. Additionally, the three-day incapacity requirement does not stand alone. It is qualified by the condition that the time of incapacity also involve "(A) Treatment two or more times by a healthcare provider, by a nurse or physician's assistant . . . under orders of, or on referral by, a health care provider; or (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health

11

care provider."[10]

PIMMS argues that Johnson cannot show that she was undergoing continuing treatment by a health care provider under § 825.114(a)(2)(i)(A) because she did not, during the two-week period at issue, receive treatment more than once by a health care provider. PIMMS further argues that Johnson cannot make a showing under § 825.114(a)(2)(i)(B) because her visit to Dr. Grelier on April 9, 1999 did not result in a regimen of continuing treatment under his supervision. While Dr. Grelier stated that Johnson might have fibromyalgia, he also stated that she might have menopausal arthralgia. He explained that his prescription of the Naprosyn was an attempt to eliminate one of the possible diagnoses. He further suggested to Johnson that she consider estrogen therapy through her gynecologist. Johnson never returned to Dr. Grelier. PIMMS argues that these facts could not possibly indicate a regimen of continuing treatment under Dr. Grelier's supervision.

Johnson's "notice of rights" claim

With regard to the plaintiff's "notice of rights" claim in Count I, PIMMS argues that the undisputed fact that Johnson received an employee "factbook" that contained an explanation of FMLA rights shortly after she began work for PIMMS should dispose of the notice claim. Johnson admits to having received the factbook in September, 1997. Johnson depo., 98. The factbook contains an explanation of FMLA rights. Lux depo., exhibit 5.

Johnson nevertheless maintains that she never knew that PIMMS had a FMLA policy. Johnson depo., 102. Johnson argues that it is PIMMS's responsibility to ensure that employees

---

[10] Indeed, interpreting the statute in the way that Johnson suggests would allow any ill employee to miss work for three consecutive calendar days and, without seeing a physician at all during those days of absence, still show that he was undergoing a continuing course of medical treatment.

know about their FMLA rights, suggesting in her brief in opposition to summary judgment that it was the responsibility of PIMMS management to personally discuss Johnson's FMLA rights with her. Additionally, Johnson argues, after she took the two weeks of medical leave in April, 1999, PIMMS had a legal obligation to investigate Johnson's leave request to determine whether it qualified under the FMLA. PIMMS argues that it was performing such an investigation when it instructed Johnson to provide certification of a serious health condition before taking further absences.

The FMLA regulations contain a "notice" type of requirement, found at 29 C.F.R. § 825.300. These particular regulations are entitled "Subpart C-- How do employees learn of their FMLA rights and obligations, and what can an employer require of an employee?" (emphasis added). The regulations require every employer "to post and keep posted on its premises, in conspicuous places where employees are employed . . . a notice explaining the Act's provisions and providing information concerning the procedures for filing complaints of violations of the Act . . . ." Id. In a more pertinent section, the regulations require that if an employer has an employee handbook (such as the PIMMS factbook), "information concerning FMLA entitlements and employee obligations under the FMLA must be included in the handbook . . . ." § 825.301. Some of this required information is specified in subsequent subsections. In § 825.301(b)(1)(ii), the FMLA requires the employee handbook to state "any requirements for the employee to furnish medical certification of a serious health condition and the consequences of failing to do so." Section 825.301(f) then states "If an employer fails to provide notice in accordance with the provisions of this section, the employer may not take action against the employee for failure to comply with any provision required to be set forth in the notice." While the PIMMS factbook states that, when FMLA leave is forseeable, PIMMS will require medical

13

certification of the employee's health condition, it does not provide notice of the consequences

for failure to provide such information. However, Johnson does not argue that the notice

contained in PIMMS's employee factbook is deficient. Johnson instead argues that PIMMS

violated the FMLA's notice requirements because the management did not personally review her

FMLA rights with her. Additionally, PIMMS contends that it did not "take action" against

Johnson for failing to provide the requested medical certification because Johnson voluntarily

resigned.

Interference with FMLA rights

Johnson claims that PIMMS interfered with her FMLA rights because its request that

Johnson submit medical certification of her health condition before taking further absences was

not part of a "uniformly applied practice or policy." Johnson contends, additionally, that

PIMMS pressured Johnson to provide a more detailed excuse than what is provided by law.[11]

Johnson argues that the FMLA permits employers to request medical certification as a condition

to receive FMLA leave only if it does so pursuant to a uniform policy, citing 29 U.S.C. §

2614(4) and 29 C.F.R. § 825.310(e). Johnson contends that PIMMS has no uniformly applied

policy of asking for medical certifications for FMLA leave, citing to page 26 of the deposition of

Jean Lux, PIMMS's corporate representative.[12] Johnson misstates the law. The plain language

of the code sections upon which Johnson relies requires a uniformly-applied policy when the

---

[11] Johnson cites no authority for this proposition and does not explain which information that PIMMS requested exceeded the regulatory requirement.

[12] Johnson's citation is potentially misleading. Although Lux does talk about deciding whether to request medical certification on a case-by-case basis, she is referring to short-term leave requests. Lux depo., 26. Later in the deposition, Lux discusses the longer-term FMLA leave requests specifically, and refers to the PIMMS FMLA policy in the employee factbook. Id., 27. The pertinent FMLA factbook section requires the employees to furnish PIMMS with advance medical documentation for FMLA leave. Id., exhibit 5.

14

employer demands a "fitness-for-duty" certification that an employee "is able to resume work." (emphasis added). 29 U.S.C. § 2614(4); 29 C.F.R. § 825.310(e). These code sections do not address an employer's requirements for the employee's receiving the leave in the first place.

Instead, 29 C.F.R. § 825.305 addresses when and how an employer can require an employee to provide medical certification to support FMLA leave. Section 825.305 requires an employer to notify an employee of a certification requirement each time certification is required. It also requires the employer to provide written notice whenever written notice is required by § 825.301. Id. As discussed, *supra*, the "written notice" requirement includes not only notice of when certification is required but also notice of the consequences of a failure to provide the certification. § 835.301(b)(1)(ii). Although PIMMS provided written notice of a certification requirement in its employee factbook, the factbook does not mention the consequences of not obtaining the certification.

Johnson argues that 29 C.F.R. § 825.310(e) requires that an employer who intends to request medical certification for a leave of absence do so either at the time the employee requests the leave or immediately after the leave commences. Again, Johnson is incorrect because § 825.310 applies only to "fitness-for-duty" reports to be used when the employee is attempting to return to work, not attempting to take a leave from work. Section 825.305, however, contains certain timing requirements applicable to the request for medical certification in order to take FMLA leave. Because § 825.305(b) applies where the leave is forseeable and the employee has provided at least 30 days notice, it is inapplicable here. Instead, § 825.305(c) better fits the facts of this case. The subsection states:

> "In most cases, the employer should request that an employee furnish certification from a health care provider at the time the employee gives notice of the need for leave or within two business days thereafter, or, in the case of unforseen leave,

within two business days after the leave commences.  The employer may request certification at some later date if the employer later has reason to question the appropriateness of the leave or its duration."

PIMMS argues that its request that Johnson provide certification of her medical condition was reasonable and within the parameters of the FMLA, citing to 29 U.S.C. § 2613(b)(1)-(4). Section 2613(a) provides for certification generally.  It then grants employers the ability to request medical certification and specifies the information needed for a certification to be sufficient.  Id.  However, it contains none of the specific notice provisions that are found in the regulations promulgated underneath it.

Retaliation under the FMLA

Finally, Johnson claims that PIMMS violated the FMLA because it fired her when she attempted to exercise her FMLA rights.  PIMMS contends that the undisputed facts of the case show that she was not terminated, but instead resigned from her employment.  To establish a prima facie case for retaliation under the FMLA, a plaintiff must show that "(1) she availed herself of a protected right; (2) she suffered an adverse employment decision; and (3) there is a causal connection between the protected activity and the adverse employment decision."  Earl v. Mervyns, Inc., 207 F.3d 1361, 1367 (11th Cir. 2000); Cash v. Smith, 2000 WL 1636989 (11th Cir. 2000).  The "adverse employment action" contemplated by the test is not limited to termination, but can encompass undeserved negative job evaluations, demotions, disadvantageous transfers, or toleration of harassment.  Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998).  However, the plaintiff's claim must cross "a threshold of substantiality" in order to implicate retaliation for protected FMLA activity.  Id.

The facts of Johnson's case are very similar to those of Graham v. State Farm Mutual Insurance, 193 F.3d 1274 (11th Cir. 1999)(per curiam).  In Graham, the plaintiff sued her former

16

employer for violation of the FMLA, alleging, among other things, the failure to inform her of her FMLA rights, interfering with her FMLA rights, and constructively terminating her employment. Id. at 1283. Like Johnson, the plaintiff had submitted a letter of resignation, but complained that she was "constructively terminated" because her employer had attached to her employment file disciplinary memoranda reprimanding her for taking medical leave that did not qualify as FMLA leave. Id. at 1279, 1281. The district court granted summary judgment to the defendant because the plaintiff, who had received all the leave that she had requested, could prove no damages under the FMLA. Id. at 1284. Upholding the district court's grant of summary judgment, the Eleventh Circuit held that "a plaintiff suffers no FMLA injury when she receives all the leave she requests, and indeed is paid for most of it." Id. at 1274. In the district court memorandum opinion, appended to the Eleventh Circuit per curiam opinion, the district judge declined to examine the plaintiff's nine separate FMLA claims in detail because "[e]ven if the defendants have committed certain technical infractions under the FMLA, plaintiff may not recover in the absence of damages." Id. at 1284.[13]

In another case, Cash v. Smith, 2000 WL 1636989 (11th Cir. 2000), the court found that the plaintiff had not availed herself of a protected FMLA right because she did not comply with her employer's request to provide medical certification of her inability to work prior to taking medical leave. Id. at *5. Actually, the plaintiff had attempted to obtain medical certification from her personal physician, but her physician had indicated on the certification form that he did not believe that FMLA leave was necessary. Id.

---

[13] The district court also found that the plaintiff had been neither actually terminated nor constructively terminated because a reasonable, prudent person would not believe that the disciplinary memorandum was the equivalent of an act of termination and because the acts of which the plaintiff complained did not indicate that her working conditions were so intolerable that she had no choice but to resign. Id. at 1284.

17

**Johnson's claims under the Equal Pay Act**

In her amended complaint, Johnson claims that when PIMMS chose her to be a senior retail merchandiser, it gave her tasks to perform in addition to those that she performed as a crew assistant. She alleges that she was not paid more money for performing the extra tasks. She then claims that she performed substantially the same duties as the male crew coordinators. Johnson claims that, in fact, she performed *more* duties as a senior retail merchandiser than the male crew coordinators, but was not paid as much as they. In addition, she claims, she was not even paid as much as the male crew assistants. Johnson claims that she was paid less than the male crew coordinators and crew assistants because she was female.

PIMMS moves for summary judgment on Johnson's EPA claim because she cannot demonstrate a prima facie case. A plaintiff makes out a prima facie case under the EPA when she shows that the employer "pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Beavers v. American Cast Iron Pipe Co., 975 F.2d 792, 801 (11th Cir. 1992). Specifically, PIMMS argues that Johnson has failed to identify a similarly-situated male employee who received more pay than she. PIMMS contends that Johnson cannot use the male crew coordinators as comparators because they were not similarly situated. PIMMS points to the fact that the crew coordinators bear the ultimate responsibility for what happens in their stores, that they receive salaries whereas crew assistants receive wages, and that they exercise supervisory authority over the crew assistants. PIMMS notes that in her deposition, when Johnson was asked to identify the men that she claimed were comparators, the men that she named were all crew coordinators.

Johnson argues that, although the crew coordinators' and crew assistants' job titles are

18

different, the tasks that they perform are indeed equal. Johnson quotes Cox and Thompson who stated in their depositions that crew assistants "basically did what a crew coordinator did." Cox depo., 40; Thompson depo., 110 (crew coordinators and crew assistants have "pretty much" the same duties). Johnson also attempts to support her argument by stating that the crew assistants performed additional duties that crew coordinators did not perform, such as training retail merchandisers.[14] Additionally, Johnson identifies in her brief in opposition to summary judgment (although not in her deposition testimony) eleven male crew assistants who allegedly were paid more than she.

PIMMS responds by arguing that Johnson's listing of male crew assistants is a "late shift" in her case theory because Johnson did not identify in her deposition any male crew assistants who were being paid more than she. However, the theory of her case on the face of her amended complaint clearly is that both male crew coordinators and male crew assistants received more pay than she. PIMMS argues that, nevertheless, Johnson cannot make out a prima facie case under the EPA because out of the eleven male crew assistant that Johnson lists, nine had, at the very least, over two years of seniority above Johnson; one had over one year of seniority above Johnson; and another had eleven months of seniority above Johnson as well as 2.5 years of experience with CVS. PIMMS cites to 29 U.S.C. § 206(d)(1)(i) for the proposition that pay differences caused by differences in seniority do not violate the Equal Pay Act.

A plaintiff establishes a prima facie case under the EPA by showing that her "employer has paid different wages to male and female employees for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar

---

[14] Johnson obviously believes that pointing out this distinction between the duties of the crew coordinators and crew assistants somehow supports her argument that those duties are equal.

19

working conditions.'" Beavers v. American Cast Iron Pipe Co., 975 F.2d 792, 801 (11th Cir.

1992)(quoting Corning Glass Works v. Brennan, 417 U.S. 188, 195, 94 S. Ct. 2223, 2228

(1974)(quoting 29 U.S.C. § 206(d)(1)).[15]   Once the plaintiff establishes a prima facie case, the

burden shifts to the defendant to prove by a preponderance of the evidence that the pay

discrepancy is justified by one of the four affirmative defenses provided by the statute.  Mulhall

v. Advance Security, Inc., 19 F.3d 586, 590 (11th Cir. 1994).[16]   This burden is a heavy one– the

defendant "must show that the factor of sex provided no basis for the wage differential."  Id.

Where, as here, the defendant moves for summary judgment under the EPA, the court must first

evaluate the plaintiff's prima facie showing in the light most favorable to her case.  Id.  If she

establishes a prima facie case under the EPA, the court must then determine whether the

defendant's affirmative defense is strong enough to "establish that there is an absence of any

issue for jury resolution."  Id.

## Johnson's prima facie case

First, the court must determine whether the plaintiff has introduced sufficient evidence to

show that she performed a job with "equal skill, effort, and responsibility" as the job of a male

crew coordinator.  With regard to the skill and effort, the plaintiff has introduced deposition

testimony from Cox, a field manager, Thompson, Johnson's area manager, and Cheri Grapes, a

---

[15]   In prior EPA case law, a pressing issue in cases involving employees in multiple offices appears to be whether the comparators proffered by the plaintiff work in the same "establishment" as the plaintiff.  Mulhall, 19 F.3d 586, 590 (11th Cir. 1994); Meeks v. Computer Assocs. Int'l., 15 F.3d 1013, 1018 (11th Cir. 1994); Brennan v. Goose Creek Consolidated Indep. Sch. Dist., 519 F.2d 53, 57 (5th Cir. 1975).  This is usually a geographical determination, although it has been held that under certain circumstances multiple offices may constitute a single establishment under the EPA.  Meeks, 15 F.3d at 1017.  The general presumption, however, is that multiple offices are not a single establishment "unless unusual circumstances are demonstrated."  Id.  Because neither party has framed the establishment issue in its briefs, the court will not address it.

[16]   "A pay differential does not violate the EPA if it is the result of (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any factor other than sex."  Meeks, 15 F.3d at 1018.

fellow crew assistant, all of whom state with varying levels of equivocation, that crew assistants and crew coordinators perform the same functions.[17]   With regard to responsibility, however, it is undisputed that crew coordinators, not the crew assistants, shouldered the ultimate responsibility to oversee the PIMMS operations in each store, which included supervising the crew assistants'work.[18]

With regard to the crew assistant comparators, Johnson has presented evidence in the form of a "Crew assistant chart" that lists what appears to be the names of crew assistants and their social security numbers, start dates, and wages.  The chart does not, on its face, state by whom it was compiled, the records from which it was compiled, or the time at which it was compiled.  The chart does not include Johnson, whose wages are hand-written at the bottom of the second page.  The chart is the only piece of evidence that Johnson has proffered to indicate that she was paid less than other male crew assistants.

### PIMMS's affirmative defense

PIMMS argues that it is not liable for any of the eleven pay discrepancies that Johnson has alleged because they are all based upon seniority.  The Eleventh Circuit has previously held that "[w]hether a seniority system exists is a matter of law."  Irby v. Bittick, 44 F.3d 949, 954 (11th Cir. 1995); Mitchell v. Jefferson County Bd. of Educ., 936 F.2d 539, 544 (11th Cir. 1991).

---

[17] Cox depo., p. 40 ("[Crew assistants] basically did what a crew coordinator did.  They were responsible for setting up fixture, doing planograms, overseeing the [retail merchandisers].");  Thompson depo., p. 110 ("The crew assistant is pretty much doing the same thing as a crew coordinator; however, the responsibility factor and leadership of the job is not placed upon his shoulders.")(emphasis added);  Grapes depo., p. 77 (crew assistants did not perform anything different from crew coordinators and occasionally filled in for an absent crew coordinator).

[18] Cox depo., p. 41 (crew coordinator has ultimate authority over particular job);  Thompson depo., p. 20 (crew coordinators supervised crew assistants), 110 ("the responsiblity factor and leadership of the job is not placed upon [the crew assistant's] shoulders. . . . [Crew coordinators] have the responsibility of it, overseeing everything.");  Lux depo., p. 67-68 ("The difference [between crew coordinators and assistants] is that the crew coordinator has the final responsibility for what does or doesn't happen in that store . . . . It would be the same as anybody who manages somebody; the buck stops with them.")

In <u>Mitchell</u>, the Eleventh Circuit, quoting the Supreme Court's definition of "seniority system" in <u>California Brewers Assn. v. Bryant</u>, 444 U.S. 598, 605, 100 S. Ct. 814, 819 (1980), stated that a seniority system is

> "a scheme that, alone or in tandem with non- 'seniority' criteria, allots to employees ever improving employment rights and benefits as their relative lengths of pertinent employment increase.  Unlike other methods of allocating employment benefits and opportunities, such as subjective evaluations or educational requirements, the principal feature of any and every 'seniority system' is that preferential treatment is dispensed on the basis of some measure of time served in employment."

936 F.2d at 544.  Building on that definition, the Eleventh Circuit held that a valid seniority system determines an employee's pay from the very outset of his or her job assignment and then, systematically, improves the employee's rights and benefits in direct correlation to the employee's length of employment.  <u>Id.</u> at 545.  The court further noted that "ever increasing rights and benefits" did not refer solely to salary increases; other important rights and benefits typically found in seniority systems include rules concerning vacations and extended health leave, order of layoff and recall, the right to bid on job openings, and order of promotions.  <u>Id.</u> at 545, 546.  In the case before it, the court refused to find a seniority system even though the employer executed a predetermined schedule of salary increases because the system did not determine the employee's initial salary and because the system affected only salary increases, not other "rights and benefits."  <u>Id.</u> at 545, 546.

In <u>Irby</u>, the Eleventh Circuit affirmed the district court's determination that the defendant sheriff's department did not maintain a seniority system justifying salary differences between the plaintiff and a male co-worker.  <u>Id.</u>  The court stated that "a seniority system, like a merit system, should be uniformly enforced and written."  <u>Id.</u> (citing <u>Irby v. Bittick</u>, 830 F. Supp. 632, 636 (M.D. Ga. 1993)).  The defendants "must be able to identify standards for measuring

22

seniority which are systematically applied and observed." Id. It "should be applied fairly among all the members of the department unless there are defined exceptions which are known and understood by the employees." Id. At this point in the litigation, PIMMS has failed to identify or offer proof of a written seniority system with such highly defined and enforced parameters. It merely states in its reply brief that the salary discrepancies are attributable to seniority, but offers neither written proof of the existence of an actual seniority system nor records of uniformly applied wage and benefits increases based on years of work.

## Johnson's claim under the Fair Labor Standards Act

In Count IV of her amended complaint, Johnson claims that PIMMS, in addition to placing her "on call" and calling her at home after hours to assign her to specific jobs,[19] required her to work overtime, but wilfully failed to compensate her at an overtime rate. Johnson claims that she was instructed by PIMMS management to "roll [the reporting of] her overtime hours over into the next week" so that they could be paid at the regular rate, and was promised "time off" for doing so. Johnson alleges that she was neither given the time off nor paid at an overtime rate for the time that she "rolled over."

PIMMS argues that, under Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686 (1946), the employee who sues under the FLSA for unpaid overtime must prove that he performed work for which he was not properly compensated by producing sufficient evidence to show the amount and extent of that work. PIMMS contends that Johnson cannot carry this burden. First, PIMMS argues, the undisputed documentary evidence shows that Johnson was paid for all of the overtime hours that she reported. PIMMS next asserts that Johnson has failed

---

[19] The court is doubtful that these particular actions, if true, implicate Johnson's over-time claim.

23

to identify a single workweek in which she reported overtime but was not paid for it. PIMMS then argues that Johnson has not introduced any evidence other than her own conclusory allegations to show that she worked more hours than she reported. PIMMS notes that Johnson's assertion that she worked "12-hour days" means nothing unless, by doing so, she worked over forty hours in one week. Finally, PIMMS points out that when Johnson first accused PIMMS of failing to pay her all the overtime that she had earned, PIMMS offered to remedy the problem if Johnson would provide the documentation, but received no response from Johnson.

Johnson contends that she has presented sufficient evidence to establish a genuine issue of material fact as to whether she was properly paid for all the overtime hours that she worked. She points to her deposition, in which she stated that she was told by three different managers to carry her overtime hours into the next week. She has presented, in support, the deposition of a co-worker, Beth Stonebraker, in which Stonebreaker states that she, too, had been instructed to not report overtime. According to Johnson, when she complained to Jean Lux about having to "roll over" her overtime, Lux told her that it was permissible. She also points to her answers to PIMMS's second interrogatories, in which she identified specific workweeks during which she worked overtime hours and was not paid overtime wages. In these interrogatory answers, found at plaintiff's exhibit 16, Johnson alleges that she was uncompensated for exactly eight hours of overtime for each of six specific weeks, and may have worked additional overtime hours during other weeks for which she was not paid as well. Specifically, Johnson claims to have worked eight hours of overtime for the following weeks: September 5, 1998; September 19, 1998; September 26, 1998; November 14, 1998; January 23, 1999; and "a week in February, 1999." Johnson produces no documentation for either the amount of overtime hours or for the weeks that she claims to have worked them.

PIMMS argues that Johnson's unsworn interrogatory answers are insufficient to show that she actually performed the overtime work and that she was not paid for it. PIMMS has also produced evidence in the form of its official payroll records to show that for most of the weeks that the plaintiff claimed she was not paid for overtime, she reported the overtime and was paid for it. PIMMS notes that, for some of the weeks, the payroll records indicate that Johnson was paid more overtime than she claimed in her interrogatory answers. Specifically, PIMMS's official payroll records show that Johnson reported and was paid for: 8.75 hours the week of September 4, 1998; 7.50 hours the week of September 18, 1998; 5 hours the week of September 25, 1998.[20] PIMMS argues that Johnson has not introduced enough evidence to create a genuine issue of fact as to the amount and extent of her work.

In order to successfully bring a basic FLSA claim for unpaid overtime, an employee "has the burden of proving that he performed the work for which he was not properly compensated." Oldon v. superior Pontiac-GMC, Inc., 765 F.2d 1570, 1578 (11th Cir. 1985)(quoting nderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687, 66 S. Ct. 1187, 1192 (1946)). The employee must prove that he actually worked certain overtime hours and that he was not properly paid for working them. Id. In a best-case scenario, the employer's payroll records will show the hours that the employee worked and the amount that he received for those hours. However,

"where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the evidence. If the employer fails to produce such evidence, the court

---

[20] The court notes that, according to PIMMS's payroll records, Johnson reported only 40 hours for the week of January 23, 1999. Johnson's allegation of a "week in February" is too vague to be evaluated definitely.

25

may then award damages to the employee, even though the result be only approximate."
Anderson, 328 U.S. at 683-684, 687-688, 66 S. Ct. at 1190-1191, 1192.

PIMMS argues that Johnson has not introduced sufficient evidence to prove the hours
that she worked by "a matter of just and reasonable inference." PIMMS would have the court be
more lenient in its application of the standard than is warranted at this point. In order for an
employee to receive the "just and reasonable inference" standard, it must first be found that the
employer's records are "inaccurate or inadequate and the employee cannot offer convincing
substitutes." Id. The Eleventh Circuit employs this standard "in situations where no records
were kept at all or no overtime was recorded." Etienne v. Inter-County Security Corp., 173 F.3d
1372, 1376 (11th Cir. 1999). In Etienne, the Eleventh Circuit refused to extend this relaxed
standard to an employee who had not proved that his employer's records were sufficiently
inaccurate or inadequate, even though the employee had shown that the employer's records were
missing an entire week, and one of his shifts had been recorded inaccurately. Id. Therefore, in
Johnson's case, until this court finds that PIMMS's records are inadequate and inaccurate,
Johnson bears the burden of proving that she worked a specific amount of overtime on a specific
date and was not paid for it.

PIMMS has produced the payroll records for the weeks that Johnson alleges to have not
to have been paid for her overtime. Johnson has not argued directly that the records themselves
are inadequate or inaccurate because of some sort of internal flaw in the computer program.
Instead, Johnson has introduced deposition testimony that the crew coordinators instructed the
PIMMS employees to "roll over" the overtime hours into the next week. Nevertheless, Johnson
has only her deposition testimony to rely upon to show that PIMMS's records are inadequate or
inaccurate with regard to specific overtime hours during the specific weeks that she claims to

have worked overtime but not reported it. Viewed in the most charitable light, Johnson's

testimony regarding the reporting of overtime hours into the IVR system is not a model of

clarity. At times, she claims that she was instructed to not report overtime at all. Johnson depo.,

p. 142-143. At other times, she claims that the IVR system would not accept the reporting of

overtime hours. Id. at 151-152, 154. Still at other times, she maintains that the employees were

permitted to report their overtime hours as long as they first received permission from their

supervisors. Id. at 145. Regardless of Johnson's testimony about the overtime hours that she

was/was not allowed/able to report to the IVR system, the payroll records show that between

August 22, 1998 and February 27, 1999, Johnson reported overtime into the IVR system seven

times and was paid overtime at least six times.[21]

**Johnson's Title VII claims**

In Counts V-VII of her amended complaint, Johnson claims that PIMMS discriminated

against her because of her sex in violation of Title VII. Johnson alleges three Title VII claims:

(1) Gender-based pay discrimination; (2) Gender-based disparate treatment; and (3) Gender-

based wrongful termination.

Gender-based pay discrimination

In Count V of her amended complaint, Johnson claims that, although she and other

female crew assistants were given additional responsibilities that the male crew assistants and

crew coordinators were not given, she was paid less than the male crew assistants and crew

coordinators. She alleges that, with the exception of her additional duties, she performed

---

[21] PIMMS's summary of its payroll records shows that Johnson reported a half-hour of overtime into the IVR system for the week of February 20, 1999, but does not state whether she was paid at an overtime rate for that half hour.

substantially the same job as the male crew assistants and crew coordinators. She also claims

that while other similarly situated male employees received pay increases, she did not receive a

pay increase, even after she asked for one. She alleges that her pay increase was conditioned

upon her completing two certification levels, while the male employees' pay increases were not

conditioned upon certification.

PIMMS disputes that Johnson actually performed additional duties while she served as a

senior retail merchandiser. Instead, PIMMS argues, during the time that Johnson spent training

the other retail merchandisers, she was *not* performing the other duties of the crew assistant job.

PIMMS also incorporates into its Title VII argument the arguments that it made with regard to

Johnson's EPA claims– specifically, that Johnson cannot show that the male employees to whom

she compares herself are similarly situated. PIMMS also argues that Johnson cannot sue for pay

discrimination under Title VII because a discretionary pay increase's being conditioned upon

passing a test does not qualify as an adverse employment action as a matter of law.[22] PIMMS

has introduced evidence that at least three male crew assistants also had their raises made

contingent upon passing certification tests. PIMMS contends that the existence of such

requirements for males indicates that Johnson cannnot show that PIMMS discriminated against

her because of her sex with regard to her pay increase. PIMMS further highlights Thompson's

deposition testimony, in which Thompson stated that he had approved a raise for Johnson that

was retroactive to August 1998, but that Johnson had resigned before it could be implemented.

Finally, PIMMS argues that, even if Johnson could make a prima facie Title VII case

---

[22] This particular argument is misplaced. Pay discrimination under Title VII does not require an "adverse employment action." It simply requires that a female plaintiff show that she was female, that she was paid less money than a male employee was paid to perform similar duties, and that the defendant's articulated reason is a pretext for discriminatory intent. Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1529 (11th Cir. 1992); EEOC v. Reichhold Chemicals, 988 F.2d 1564, 1570 (11th Cir. 1993).

28

against it, Johnson has presented no evidence that its proffered reason for the pay disparity– the difference in the levels of responsibility and accountability between crew coordinators and crew assistants the differences in seniority between Johnson and the other male crew assistants, and CVS's demands for employee certification– is a pretext for gender discrimination. PIMMS asserts that Johnson has introduced no evidence that PIMMS intentionally discriminated against her because of her sex.

In support of her Title VII pay discrimination claim, Johnson points to the fact that, although she began requesting the pay increase in August, 1998, she was not administered the necessary tests until January 1999 and March 1999.  Johnson also points to evidence that she feels shows that Area Manager Thompson selectively enforced the certification requirement by not requiring crew coordinators to be certified.[23]  Johnson uses male crew coordinator James Daniel Johnson as an example of a crew coordinator who was not required to be certified and who was given a pay increase that was not contingent upon attaining a certain certification level.

PIMMS responds by re-emphasizing its argument that crew assistants' and crew coordinators' positions are not sufficiently similar to qualify them as wage comparators in violation of Title VII.  PIMMS also re-emphasizes its argument that the differences in all of the salaries that Johnson points to can be explained through differences in seniority.

A female plaintiff establishes a prima facie Title VII wage discrimination claim by showing by a preponderance of the evidence "that she is female and that the job she occupied was similar to higher paying jobs occupied by males." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1529 (11th Cir. 1992).  Once the plaintiff establishes the prima facie case,

---

[23] The existence of female crew coordinators (Cox depo., p. 22, 132) tends to dilute Johnson's suggestion that Thompson's not requiring the crew coordinators' to be certified indicates a gender-based animus.

29

the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the alleged disparity. Id. If the defendant articulates this legitimate nondiscriminatory reason, the burden shifts back to the plaintiff to demonstrate "that the proffered justifications are actually a pretext for gender-based discrimination. In other words, [plaintiff] must demonstrate that a discriminatory reason more likely than not motivated [defendant] to pay her less, or that [defendant's] explanation is not worthy of belief." Id. Two elements of the Title VII wage discrimination claim distinguish it from the EPA claim: (1) The standard of similarity between the male/female jobs is relaxed; and (2) The plaintiff must show that discriminatory intent motivated the defendant. EEOC v. Reichhold Chemicals, 988 F.2d 1564, 1570 (11th Cir. 1993).

In the instant case, it is undisputed that the plaintiff is female and that there were at least some male crew coordinators and male crew assistants whose wages were higher than hers. With regard to the male crew coordinators, the issue is whether the plaintiff's job and the crew coordinator's jobs are sufficiently similar for the plaintiff to meet her prima facie case. As discussed above, the deposition testimony unilaterally shows that the crew assistants' and crew coordinators' job duties largely overlapped, with the exception of the crew coordinators' having the ultimate responsibility to oversee the store and possessing supervisory authority over the crew assistants.

Assuming that Johnson has proven a prima facie case for both crew assistants and crew coordinators, the burden shifts to PIMMS to articulate a legitimate, non-discriminatory reason for the apparent disparity. PIMMS's articulated reason is, in the case of the male crew coordinators, that they possessed ultimate responsibility and supervisory authority where Johnson did not, and, in the case of the male crew assistants, that they had more seniority than Johnson. The burden now shifts back to Johnson to show that, more likely than not, PIMMS's

articulated reason is a pretext for discriminatory intent.

Gender-based disparate treatment

In her amended complaint, Johnson basically restates verbatim the allegations used in the EPA/Title VII pay discrimination and FMLA retaliation claims. Then she alleges that PIMMS forced her resignation because she had taken two weeks of FMLA-qualified medical leave, and claims that PIMMS did not retaliate against other similarly situated male employees who had taken two weeks of FMLA-qualified medical leave. She claims that PIMMS's behavior toward her was based on her gender.

PIMMS argues that Johnson has failed to marshal sufficient evidence to raise a genuine issue as to whether she was discriminated against because of her gender. In doing so, PIMMS incorporates its prior arguments under Johnson's EPA, FMLA, and other Title VII claims. With regard to the plaintiff's allegation that she was discriminated against with respect to leave and forced to resign, PIMMS argues that the evidence shows that it granted all of Johnson's requests for leave and that it did not take any adverse employment action against her either actively or constructively.

Johnson maintains that she has introduced enough evidence to state a prima facie case of disparate treatment as well as sufficient evidence to survive summary judgment on the issue of pretext. She points to Thompson's testimony that he could not recall asking any other employee for a physician's certification to miss work, even though other male employees had missed more than one week of work. She also notes that Lux was unable to identify a male crew assistant or crew coordinator whom Thompson terminated or forced to resign. As further evidence of gender-based discrimination, Johnson offers the evidence used to support her other claims– the additional duties, the conditioning of a pay raise upon certification, the selective enforcement of

31

the certification requirement, the apparent discrepancy in pay between her and the male crew

assistants and crew coordinators– and argues that the male crew assistants and crew coordinators

were not subjected to these demands or discrepancies. Johnson contends that she has introduced

sufficient evidence to create an issue of fact as to whether her job and the jobs of the male crew

coordinators are so similar that she and the crew coordinators can be considered to be "similarly

situated." Moreover, Johnson argues that the standard for similar jobs is more relaxed under

Title VII than for the EPA. Johnson asserts that she has shown that PIMMS intended to

discriminate against her by offering evidence that even after she complained to Thompson about

the pay discrepancy and asked for a raise, Thompson refused to grant her request.

A female plaintiff establishes a successful prima facie case of disparate treatment under

Title VII by showing that: "(1) she is a member of a protected class; (2) she was subjected to

adverse employment action; (3) her employer treated similarly situated male employees more

favorably; and (4) she was qualified to do the job." EEOC v. Joe's Stone Crab, Inc., 220 F.3d

1263, 1286 (11th Cir. 2000); Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). It is

undisputed that Johnson is female, a member of a protected class, and that she was qualified to

do her job. However, PIMMS maintains that Johnson was not subjected to an adverse

employment action because she voluntarily resigned from her employment. Johnson contends

that her resignation was not voluntary, but that PIMMS subjected her to an adverse employment

action by issuing the ultimatum to either provide medical certification for future absences, come

to work on Monday, or be terminated. Johnson further appears to argue that, in addition to the

ultimatum, PIMMS subjected her to an adverse employment decision when it required her to be

certified before receiving her pay increase. PIMMS argues that conditioning a "discretionary"

pay increase upon certification also does not qualify as an adverse employment decision.[24]

In Llampallas v. Mini-circuits, Lab, Inc., 163 F.3d 1236, 1245 (11th Cir. 1998), the

Eleventh Circuit characterized an Title VII disparate treatment adverse employment action as

"an alteration in the terms and conditions of [the employee's] employment by the employer. . . ."

Later in the opinion, the court stated that

"a tangible employment action– e.g., demotion or discharge is clearly an alteration in the terms

and conditions of the plaintiff's employment." Id. at 1247.  The court explained that

> "It is only when [discriminatory] animus causes an alteration in the terms and conditions
> of the plaintiff's employment that the employer will be held liable to the plaintiff under
> the statute. A Title VII plaintiff may establish such an alteration by showing either (1) a
> tangible employment action, which "itself constitutes a change in the terms and
> conditions of employment," or (2) the existence of an 'abusive working environment,'
> which courts recognize as synonymous with a 'constructive' alteration in the terms and
> conditions of the plaintiff's employment."

Id. at n. 19. Furthermore, even a tangible employment action, in order to constitute an "adverse

employment action," must pass an objective test to determine whether "a reasonable person in

[the plaintiff's] position would view the employment action in question as adverse."  Hinson v.

Clinch County, 2000 WL 1587655, *6 (11th Cir. 2000).  An employment action is objectively

adverse if it involves "a reduction in pay, prestige, or responsibility," or causes the employee "to

perform more menial tasks."  Id. at *6, *7.  Moreover, the discriminatory action for purposes of

suit occurs when the adverse employment decision is made, not when it goes into effect.  Nance

v. Maxwell Federal Credit Union, 186 F.3d 1338, 1341 (11th Cir. 1999).

In the instant case, PIMMS's employment decision gave Johnson four choices: (1) return

to work on Monday; (2) provide PIMMS with medical certification in order to take a future

---

[24] The court notes that PIMMS's characterization of its pay increase as "discretionary" does not aid its
"seniority system" argument.

33

leave of absence; (3) resign; or (4) be terminated. Had Johnson returned to work the following

Monday, there is no evidence to indicate that her position with PIMMS would have changed in

the least. Had she provided PIMMS with a physician's certification of her medical condition,

there is also no evidence to indicate that her employment position would have changed. The

other two options, of course, constitute a tangible change in employment conditions. However,

there is no evidence that PIMMS had decided to take those actions at the time that Johnson

resigned.

### Gender-based wrongful termination

In Count VII of her amended complaint, Johnson claims that she was forced to resign

because of her gender. Johnson claims that Thompson, the area manager, wanted to remove

female crew assistants from their positions. She alleges that Thompson went to great efforts to

sabotage her performance by setting her up to receive a low score on evaluations, placing her

with difficult supervisors, changing her schedule, and giving her tasks to accomplish with

unreasonable deadlines. Johnson claims that Thompson treated the other female crew assistants

in the same way. She asserts that the reason that PIMMS gave for terminating her employment,

taking more than two weeks off from work, was pretextual because other male employees had

taken as much time off from work and had not been "forced to resign."

PIMMS argues that it is entitled to summary judgment for Johnson's wrongful

termination claim because Johnson voluntarily resigned from her position. PIMMS also

contends that Johnson has not presented sufficient facts to warrant a finding of constructive

discharge, especially since she was not even present in the workplace for two weeks prior to her

resignation. PIMMS argues that the undisputed evidence shows that PIMMS instructed Johnson

to either produce certification for further absences, show up for work, or be terminated. PIMMS contends that the plaintiff made only a half-hearted attempt to obtain certification from a physician and, in a "knee-jerk reaction," voluntarily resigned instead of attempting to get a second opinion or to ask for more time from PIMMS to obtain certification. Additionally, PIMMS argues that because Johnson cannot prove that she was discharged, either actually or constructively, Johnson is not entitled to back pay under any of her remaining claims.

Johnson specifically disclaims an assertion of constructive discharge. Instead she argues that she was "effectively terminated" by PIMMS's ultimatum, even though she technically resigned. She argues that because of her physical limitations and her inability to obtain medical certification, she was forced to either submit a letter of resignation or be terminated. Furthermore, Johnson argues, she was "forced to resign" because she was female. She points to the deposition testimony and affidavit of Glenda cox, her immediate supervisor, in which Cox states that Thompson often expressed a desire to eliminate Johnson. Cox further claims that Thompson deliberately attempted to cause Johnson to receive poor evaluations by giving her impossible tasks. Additionally, Johnson highlights Cox's statement in her affidavit that Thompson was biased against women and that Cox herself was considered to be Thompson's vehicle to eliminate female employees. Finally, Johnson points to the depositions of Cox and co-worker Cheri Grapes, both of whom stated that Thompson forced Grapes to make a choice similar to Johnson's– either go to a store in Alabama, leaving her elderly mother and young daughter in North Carolina even though positions in North Carolina were available, or be fired. Johnson contends that PIMMS has been unable to produce evidence of male crew assistants or crew coordinators being treated in a similar way. Johnson argues that this evidence is sufficient to allow her Title VII wrongful termination claim to survive summary judgment.

35

PIMMS first responds by arguing that only two available avenues for a wrongful discharge action under Title VII exist: actual termination or constructive discharge. PIMMS concludes that because it did not actually terminate Johnson and because Johnson has disavowed a claim for constructive discharge, her wrongful termination claim must fail. It contends that its ultimatum did not amount to termination of Johnson's employment. PIMMS emphasizes that, when Dr. Grelier refused to certify that she was unable to work, Johnson could have attempted to obtain a second medical opinion and could have asked PIMMS for additional time to do so.

"An employee establishes a prima facie case of discrimination in termination when the employee shows (1) membership in a protected class, (2) qualification for the position held, (3) termination, and (4) replacement with a person outside the protected class." Walker v. Nationsbank of Florida N.A., 53 F.3d 1548, 1556 (11th Cir. 1995); see also Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1375 (11th Cir. 1996)("plaintiff may establish a prima facie case by demonstrating that "(1) he was a member of a protected class (2) he was qualified for the job, (3) he was terminated despite his qualifications, and (4) after his termination the position remained open and the employer continued to seek applicants of similar qualifications."). PIMMS contends that Johnson cannot establish that she was terminated either actually or constructively and, therefore, cannot establish her prima facie case.

Johnson admits that she was not constructively terminated. In her brief in opposition to summary judgment, Johnson states that "Ms. Johnson, however, does not argue that she was constructively discharged. Ms. Johnson argues that she was effectively terminated (i.e. forced to resign) because she was given the option of termination or resignation." Johnson, brief in opposition to summary judgment, p. 13 n. 9. (emphasis added). Actually, Johnson was given more options than just termination or resignation– she could also have either gone to work on

36

Monday or offered certification for future medical leave. PIMMS argues that because it did not specifically use the words "You're fired" and because Johnson agrees that she was not "constructively discharged" by intolerable conditions in the workplace, no other avenue exists for Johnson to prove that she was terminated because of her sex.

In reality, the "actual termination" prong of the discriminatory discharge prima facie case is more complex than PIMMS characterizes it. In Thomas v. Dillard Department Stores, Inc., 116 F.3d 1432, 1434 (11th Cir. 1997), the Eleventh Circuit held that the "actual termination" inquiry does not end in the absence of the immediate, forceful removal of the employee from a position with the employer. Instead, the court, analyzing Title VII and ADEA cases from other circuits, found that actual termination could exist in situations such as when the employee is demoted from a higher position to a more menial position, or is changed from a full-time employee to a part-time employee under circumstances that indicate that the reason for the demotion or reduction in work hours is based on a protected characteristic. Id. at 1434-1435. According to the court, "the case law makes clear that the inquiry as to whether actual termination has occurred involves analysis of the employer's intent." Id. at 1434 (citing Payne v. Crane Co., 560 F.2d 198, 199 (5th Cir. 1977)(finding of termination occurs . . . when employer "by acts or words, shows a clear intention to dispense with the services of an employee")). "The decisional law also establishes that the issue of whether an actual termination has occurred is determined in light of the particular circumstances of the controverted job action." Id. (citing Chertkova v. Connecticut General Life Ins. Co., 92 F.3d 81, 88 (2d Cir. 1996)("An actual discharge . . . occurs when the employer uses language or engages in conduct that 'would logically lead a prudent person to believe his tenure has been terminated."); Schneider v. Jax Shack, Inc., 794 F.2d 383, 385 (8th Cir. 1986)(in determining whether actual

37

discharge has occurred, "the realities of the employee's situation, as well as the employer's label for its job action, should be taken into account")).

In the instant case, the "controverted job action" is PIMMS's calling Johnson after Johnson's taking two weeks of un-certified medical leave, requesting that she either come to work on Monday or provide medical certification for future leave, and threatening her with termination if she refused. Johnson had not yet been removed from her position either at the time of PIMMS's telephone call, or at the time that she submitted the letter of resignation to PIMMS.

## CONCLUSIONS OF COURT

District courts have often been admonished by appellate courts to define and refine the issues. This case is a typical example of the "kitchen sink" kind of complaint that requires much time and effort to attempt to reduce to essence. Based upon the foregoing discussion, the court reaches the following conclusions:

(1) It is clear that the plaintiff was neither actually, constructively, nor "effectively" terminated by the defendant. She apparently acknowledges that she was not actually or constructively terminated. For reasons discussed above, the court concludes that she was not "effectively" terminated.

(2) The court concludes that the plaintiff has not offered substantial evidence sufficient to establish a reasonable inference of any FMLA claim. She had notice of her rights. The evidence does not show that she was engaging in a continuous course of treatment. She received all the leave that she requested until she resigned. See other discussion above. See also Graham and Cash, *supra*, for other comparisons.

(3) The court concludes that the plaintiff cannot recover under either the EPA or Title VII

38

based on comparing pay with crew coordinators who had more responsibility and were otherwise not similarly situated.

(4) The court concludes that the plaintiff cannot recover under the FLSA. The plaintiff has not submitted evidence that she performed overtime work for which she was not properly paid, other than bald assertions in her own deposition that are no more specific than "I worked overtime hours for which I wasn't paid." PIMMS records show that Johnson actually submitted overtime hours throughout her employment and was paid for her the hours that she reported. She has not submitted sufficient evidence to show that she worked the hours that she claims as a matter of just and reasonable inference under Anderson.

(5) The plaintiff has made a number of conclusory discrimination claims. In many instances there is no evidence of an adverse action. In any event, many of the claims are based on alleged hostility with no evidence of gender-based animus.

The only possible claims that remain are the plaintiff's EPA claims and the Title VII pay discrimination claim based on a comparison with the other crew assistants. In this regard, the court directs the parties to, within 10 days, call to the court's attention admissible evidence now in the record of:

Defendant- specific evidence supporting a claim of a "seniority system" as discussed above.

Plaintiff- male crew assistants who were allegedly paid more for the same or similar work or for equal work which requires equal skill, etc.

In such instance, the parties will file nothing but direct quotes from depositions, etc., and exhibit excerpts; not paraphrasing, argument, etc. The parties will have 7 days to respond.

This 8th day of December 2000.

ROBERT B. PROPST

SENIOR UNITED STATES DISTRICT JUDGE